## Prather, Administrator, et al. v. Prather, By, etc.

(Decided January 31, 1922.)

### Appeal from Washington Circuit Court.

1. Bastards—Legitimation—What Must be Proved to Show Legitimation.—Under Kentucky Statutes, section 1398, providing that if a man, having a child by a woman, shall afterwards marry her, such child, if recognized by him before or after the marriage, shall be deemed legitimate, it is necessary to show that the child was begotten by the decedent, that he afterwards married the child's mother and that he recognized the child as his own.

2. Bastards—Legitimation—Marriage of Parents—Statute Applies to Marriage Contracted to Avoid Criminal Prosecution for Seduction. —Kentucky Statutes, section 1398, applies to a marriage contracted to avoid a criminal prosecution for seduction, as authorized by section 1214, Kentucky Statutes.

3. Bastards—Legitimation—Finding of Chancellor—Sufficiency of Evidence.—In an action involving legitimation of a child under Kentucky Statutes, section 1398, evidence held to sustain the finding of the chancellor that the child was begotten and recognized by the reputed father.

W. C. McCHORD, J. H. McCHORD and MARSHALL DUNCAN for appellants.

VICTOR KELLEY and JOHN POLIN for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

George Prather, a resident of Washington county, died intestate on January 19, 1919. His brother, I. P. Prather, qualified as his administrator, and brought suit to settle his estate. During the progress of the action an issue was made as to who were the heirs of the decedent, his father and mother, Thomas W. Prather and Eliza Ann Prather, or Georgia Ethert Prather, an infant, who, it is claimed, was begotten and recognized by the decedent as his child after his marriage to the child's mother, Letitia Hardin. Judgment was rendered in favor of the infant, and the administrator and the father and mother of the decedent appeal.

The undisputed facts are as follows: Decedent had been going to see Letitia Hardin for a number of years, and was practically the only man who paid her any attention. On March 22, 1914, Letitia Hardin, then unmarried, gave birth to the infant, Georgia Ethert Prather. On the following day, Thomas Hardin, Letitia's

father, caused a warrant to be issued, charging the decedent with the offense of seduction under the promise of marriage. .The decedent was arrested under the warrant, and gave bond in the sum of $250.00. A few days later, the decedent, accompanied by one Mark Coulter, went to the home of Thomas Hardin and proposed to marry Letitia. This plan was consented to and the marriage took place at Bardstown on April 17, 1914. He returned that night with his wife to the home of Thomas Hardin, spent the night there and left the next morning about eight o'clock. Instead of returning, he went to the state of Illinois, where he remained for some time. On his return he induced his wife to bring suit for divorce, under the promise to marry her again after the divorce was obtained.

Section 1398, Kentucky Statutes, is as follows:

"If a man having had a child by a woman shall afterwards marry her, such child or its descendants, if recognized by him before or after marriage, shall be deemed legitimate."

Under this statute it was necessary to show (1) that the child was begotten by the decedent; (2) that he afterwards married the child's mother, and (3) that he recognized the child as his own. Stein v. Stein, 106 S. W. 860; 7 C. J. 949. The evidence is practically uncontradicted that decedent was the father of the infant, and as he subsequently married its mother, the only real question in the case is whether he recognized the child as his own.

On the question of recognition, the evidence for the child is as follows: The child's mother testified that, on the morning following the marriage, Prather fondled and kissed the child and gave her $10.00 with which to purchase the child a cloak and cap. Prather then left, and she did not see him for several months. The divorce was obtained at the instance of Prather, who paid her alimony in the sum of $150.00 and at the same time gave the baby a cow, stating that he wanted his baby provided for. After the divorce was granted, Prather came to see Letitia and the baby, and on one occasion gave Letitia two photographs of himself, stating that one was for her and one for the baby, in order that the baby might have something by which to remember her father. Ida Satterly, a sister of Letitia, deposed that, on one occasion, Prather stopped by her house to tell her about her uncle

being in trouble. While there, he asked her when she had seen his wife and baby. She asked him if he really thought that was his baby. He replied that he knew that it was his baby, and that he was going to take it and maintain it; that he had loved its mother ever since she was thirteen years old. This conversation took place about the first of April, and before the marriage. Thomas Hardin, Letitia's father, deposed that, when Prather and Coulter came to his house, Prather stated that he and Letitia had been expecting to get married for over a year, and that he had intended to marry her all the time. Prather further stated that he knew the child was his and no one's else. Next morning after the wedding, Prather stated that he wanted to get plenty of nice clothes for his wife and baby, and that if any of his family made any kick about his bringing her home, he was going to buy a lot at Willisburg. He also gave Letitia some money and told her to get herself and the child some clothes. Later on, and after the divorce was granted, the witness was in Jefferson county. Prather came to see him and told him he wanted to have a talk with him. In the conversation Prather stated that he had given Letitia a divorce and wanted the witness to take care of his child, and if the witness needed any money, he would furnish it. He further stated that he did not want any man to be over his child; that he had put a cow in Letitia's hands for the benefit of the child, and that he wanted the witness to see that the child got the benefit of the cow. Witness further stated that he met Prather about three weeks before his death, and that Prather stated that he wanted to talk to him about his child, and wanted witness to take the child and keep it. Mary Bell Trent, another sister of Letitia, testified that when Prather came to her father's house to make arrangements for the marriage, he stated that he wanted to take Letitia and treat her as a lady. She accompanied them to the place where they were married. On the morning after the marriage, he gave Letitia some money to buy the baby clothes. He stated that his mother was willing for him to bring Letitia home, but the others were not, and if they would not let him bring her home, he would make other arrangements. When he left he kissed the baby goodbye. About a month after the divorce proceedings, Prather came to her house and stated

that he did not want to live with Letitia under the license; that they would get a divorce and would marry again. At that point he took the baby up and made over it. At other times he came to see Letitia and the baby, and would make over the child just as other fathers make over their children. She further stated that Prather had red, sandy hair, and that the baby was red headed and looked like him. Harrison Trent testified that Prather came to his house several times, both before and after the divorce. At that time Letitia and the baby were at his house. On one occasion there was a dance at Albert Mattingly's, and Prather asked him to dance with Letitia, so no one else would dance with her. Lucy Hardin, mother of Letitia, testified that she had a talk with Prather after the divorce was obtained. In that conversation he stated that he knew the baby was his child, and wanted it to have a good education. He further stated that he would rather that the baby stay with her, and if she needed any assistance all she had to do was to call on him.

On the other hand, T. M. Prather testified that George never lived with Letitia after the marriage, but went to Illinois, where he remained for six months. About a year after the marriage, he was arrested for not living with Letitia. George told him that the child was not his. At the time of his death, George was about thirty-four years of age. John D. Shields deposed that he had a conversation with George Prather shortly before he married. George stated that he had been arrested, and asked the witness what he should do about it. George said, "John, I would rather go to Frankfort than marry that woman; that child is not mine." Witness told George that if the woman swore the child was his, he would have to prove that it was not. Witness advised George that he could marry the woman, but would not have to live with her. After the divorce, George stated to him that the matter was all over with and it had cost him about $275.00. He further stated that the child was not his and he was out of it now. On cross-examination he stated that George was never married to any one else. E. P. Dedman testified that he went with George to Bardstown, soon after the arrest, to see Judge Fulton. George stated to Judge Fulton that he had been arrested in the county court, but that he was innocent and the child was not his. At the same time he said that he

thought a young fellow by the name of Jesse Flowers was the father of the child. George further stated to witness that he had heard if a woman went into open court and swore a child to a man, there was no alternative but to marry her, as her evidence predominated. After the marriage, George stated to him about a half dozen times that the child was not his. Witness was present when George made out his questionnaire and George asked if he was entitled to exemptions on account of the Cutsinger child. H. L. Cheatham testified that he had known George Prather ever since they were boys. When George returned from Illinois, George said that the child was not his, and that he did not expect to live with Letitia or maintain the child. Johnnie Prather, a cousin of George Prather, testified that, about two weeks before George's death, George stated that he did not have but one child and that was the Cutsinger child. Witness further stated that George was not married to Ada Cutsinger. Tom Trent also testified that George stated to him that the child of Letitia Hardin was not his. I. P. Prather, George's brother, testified that George stated to him that the baby was not his. He further testified that George left in April and did not return from Illinois until June or July following. Witness also testified that, just before George's death, George stated to him that he did not want the Hardin child or its mother to have anything that he had. On cross-examination witness stated that he advised George, prior to his marriage to Letitia Hardin, not to marry her.

It is first suggested that the marriage contemplated by section 1398, *supra,* is a voluntary marriage followed by a voluntary cohabitation, and not a marriage contracted to avoid a criminal prosecution. The seduction statute (section 1214, Kentucky Statutes) provides that a prosecution for seducing a female under twenty-one years of age shall be suspended where the defendant marries, or offers to marry, the girl seduced before final judgment. In construing section 1398, it has been held that a child, begotten and born before the marriage of its parents, was legitimated by such marriage and entitled to share in its father's estate, though the marriage was void on account of the mothers's having a living husband from whom she was not divorced. If this be true, it cannot be said that the statute does not apply to a marriage authorized and sanctioned by law. Further-

more, as the defendant may avoid the punishment by marrying, or offering to marry, the girl seduced, even after there has been a trial and verdict of guilty, rare, indeed, would be the occasion when a man, conscious of his own innocence, would not take the chances of an acquittal before entering into a marriage so repugnant.

It is further insisted that the evidence of recognition is insufficient. In this connection it is pointed out that Prather did not want to marry Letitia Hardin and would not have done so except to escape the consequences of a criminal prosecution; that he did not cohabit with his wife; that he did not take or offer to take the child to his home; that he never supported the child or made any contributions to its support except the $10.00 which he is said to have given the mother on the morning after the marriage, and the sum which he paid as alimony; that he never admitted in his home, or in the community in which he lived, or among his friends and acquaintances that he was the father of the child; that from the day of the birth of the child until his death he denied publicly and privately that he was the father of the child; and that any statements which he made to the contrary were made to the immediate family of the child's mother, and were not made in good faith, but only for the purpose of avoiding the criminal prosecution.

It must not be overlooked that our statute is not like the statutes of some states, which require a written or other formal acknowledgment of a child. Mere recognition is all that our statute requires, and recognition may be shown by the statements or conduct of the reputed father. Cases frequently arise where the reputed father makes no statement one way or the other, and in such cases, the conduct of the father furnishes the only evidence on the question. In that event, it is necessary to show that the reputed father took the child into his home, or provided for it elsewhere, and treated it as his own, and the absence of such evidence would be conclusive on the question of legitimation. But under our statute the word, "recognize," means acknowledge or admit as your own, and a reputed father may admit that a child is his, and thereby recognize it, even though he neglects to perform the duties of a father. Therefore, such neglect will not be conclusive on the question, but is mere evidence tending to overcome his declarations that the child is his. In this case we have to take into considera-

tion on the one hand that some of the declarations made by Prather were made to placate the relatives of the woman he had wronged, while the declarations made to the members of his own family and his particular friends were made in view of the criminal prosecution.    But aside from these statements, he made statements to Letitia's father and mother after the divorce was granted, and after the danger of the prosecution had passed, that he wanted them to take care of his child, and that if they needed anything, to call on him.    Moreover, his act, in giving his former wife two photographs, one for her and one for the baby, so that the baby would remember him as her father, is a very strong circumstance tending to show that he recognized the child as his own. On the whole, we conclude that the evidence is sufficient to sustain the finding of the chancellor that the child was begotten and recognized by the decedent.

Judgment affirmed.